UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

DANIEL COLBY, JR.,          )
                                         )
          Petitioner,          )
                                         )
          v.                    )       2:15-cr-00182-GZS
                                         )       2:18-cv-00429-GZS
                                         )
UNITED STATES OF AMERICA,   )
                                         )
          Respondent        )

## RECOMMENDED DECISION ON 28 U.S.C. § 2255 MOTION

In this action, Petitioner Daniel Colby, Jr., moves, pursuant to 28 U.S.C. § 2255, to vacate, set aside or correct his sentence. (Motion, ECF No. 146.) Following a jury trial, Petitioner was convicted of possession of a firearm by a felon; the Court sentenced Petitioner to 95 months in prison. (Judgment, ECF No. 125 at 1-2.) The First Circuit affirmed the sentence on appeal. *United States v. Colby*, 882 F.3d 267 (1st Cir. 2018).

After a review of the record, Petitioner's motion, and the Government's request for dismissal, I recommend the Court grant the Government's request, and deny Petitioner's request for relief.

### I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Following a two-day jury trial and guilty verdict in June 2016, Petitioner was convicted in December 2016 of a single count of possession of a firearm by a prohibited person, pursuant to 18 U.S.C. § 922(g)(1). (Judgment at 1; Trial Transcripts I, II,

ECF Nos. 113, 114.) The Court sentenced Petitioner to a prison term of 95 months, followed by a term of three years of supervised release. (Judgment at 2-3.)

Petitioner appealed from the sentence and argued the Court erred when it imposed three sentencing enhancements. *Colby*, 882 F.3d at 269. The First Circuit concluded that the Court did not err when it found Petitioner possessed a stolen gun, and therefore the Court did not err when it imposed a two-level enhancement for possession of a stolen firearm, pursuant to USSG § 2K2.1(b)(4)(A), *id.* at 272-73; that the Court did not err when it found Petitioner had threatened another (Forrest Smith) with the gun, and therefore the Court did not err when it imposed a four-level enhancement for possession of a firearm in connection with another felony offense, pursuant to USSG § 2K2.1(b)(6)(B), *id.* at 273; and that the Court did not err when it imposed a two-level enhancement for obstruction of justice, pursuant to USSG § 3C1.1, based on the Court's conclusion that Petitioner's "completely contradictory accounts" of "key facts in his case" were not the result of "'confusion, mistake, or faulty memory,'" *id.* at 273-74 (quoting *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)). The Supreme Court denied Petitioner's petition for a writ of certiorari. *Colby v. United States*, 138 S. Ct. 2664 (2018).

In Petitioner's section 2255 motion, he claims the Court lacked jurisdiction over his criminal prosecution because 18 U.S.C. § 3231 violates the Quorum Clause of the United States Constitution; he alleges trial and appellate counsel provided ineffective assistance; and he alleges prosecutorial misconduct and judicial bias.[1]

---

[1] Petitioner asserts that he signed his section 2255 motion and placed it in the prison mailing system on October 9, 2018. (Motion, ECF No. 146 at 12.) The Government acknowledges Petitioner's section 2255

## II.  DISCUSSION

### A.  Legal Standards

A person may move to vacate his or her sentence on one of four different grounds: (1) "that the sentence was imposed in violation of the Constitution or laws of the United States"; (2) "that the court was without jurisdiction" to impose its sentence; (3) "that the sentence was in excess of the maximum authorized by law"; or (4) that the sentence "is otherwise subject to collateral attack." 28 U.S.C. § 2255(a); *see Knight v. United States*, 37 F.3d 769, 772 (1st Cir. 1994).

"[P]ro se habeas petitions normally should be construed liberally in petitioner's favor." *United States v. Ciampi*, 419 F.3d 20, 24 (1st Cir. 2005) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).  However, the burden is on the section 2255 petitioner to establish by a preponderance of the evidence that he or she is entitled to section 2255 relief. *David v. United States*, 134 F.3d 470, 474 (1st Cir. 1998); *United States v. DiCarlo*, 575 F.2d 952, 954 (1st Cir. 1978).  When "a petition for federal habeas relief is presented to the judge who presided at the petitioner's trial, the judge is at liberty to employ the knowledge gleaned during previous proceedings and make findings based thereon without convening an additional hearing." *United States v. McGill*, 11 F.3d 223, 225 (1st Cir. 1993).

---

motion was timely filed.  (Response, ECF No. 157 at 1-2.)  *See* 28 U.S.C. § 2255(f) (providing in pertinent part that "[a] 1-year period of limitation shall apply to a motion under this section.  The limitation period shall run from the latest of – (1) the date on which the judgment of conviction becomes final . . . .").

A collateral challenge is not a substitute for an appeal. *United States v. Frady*, 456 U.S. 152, 165 (1982); *Berthoff v. United States*, 308 F.3d 124, 127 (1st Cir. 2002). "Accordingly, a defendant's failure to raise a claim in a timely manner at trial or on appeal constitutes a procedural default that bars collateral review, unless the defendant can demonstrate cause for the failure and prejudice or actual innocence." *Berthoff*, 308 F.3d at 127-28. Procedural default is an affirmative defense. *Sotirion v. United States*, 617 F.3d 27, 32 (1st Cir. 2010). The First Circuit has recognized that "federal courts have the authority to consider procedural default *sua sponte.*" *Rosenthal v. O'Brien,* 713 F.3d 676, 683 (1st Cir. 2013) (citing *Brewer v. Marshall,* 119 F.3d 993, 999 (1st Cir. 1997)); *see also Daniels v. United States*, 532 U.S. 374, 382-83 (2001) (recognizing that "procedural default rules developed in the habeas corpus context apply in § 2255 cases") (citing *Frady*, 456 U.S. at 167-68).

An allegation of ineffective assistance of counsel can excuse a procedural default if the petitioner demonstrates that counsel's representation "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). The petitioner must also demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. A district court reviewing a claim of ineffective assistance of counsel need not address both prongs of the *Strickland* test because a failure to meet either prong will undermine the claim. *Id.* at 697.

If a petitioner's "claims fail on the merits, his related claims that counsel rendered ineffective assistance in failing to press the claims at trial or on appeal must also fail." *Tse v. United States*, 290 F.3d 462, 465 (1st Cir. 2002) (per curiam).

"Evidentiary hearings on § 2255 petitions are the exception, not the norm, and there is a heavy burden on the petitioner to demonstrate that an evidentiary hearing is warranted. An evidentiary hearing 'is not necessary when a [§] 2255 petition (1) is inadequate on its face, or (2) although facially adequate, is conclusively refuted as to the alleged facts by the files and records of the case.'" *Moreno-Morales v. United States*, 334 F.3d 140, 145 (1st Cir. 2003) (citation omitted) (quoting *DiCarlo*, 575 F.2d at 954 (quotation marks omitted)).

Summary dismissal of a motion is permitted when the allegations are "'vague, conclusory, or palpably incredible,'" even "'if the record does not conclusively and expressly belie [the] claim.'" *David*, 134 F.3d at 478 (quoting *Machibroda v. United States*, 368 U.S. 487, 495 (1962)). A court can reasonably require a petitioner to supply the court with salient details of the claim prior to permitting discovery or a hearing. *Id.* (holding that "the district court did not abuse its discretion in refusing to license a fishing expedition").

## B. Claims and Analysis

### 1. Claim of lack of jurisdiction

Petitioner contends that Public Law 80-772, which is codified in relevant part at 18 U.S.C. § 3231, and which provides in part that "[t]he district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against

the laws of the United States," was not properly enacted by Congress. Petitioner argues section 3231 violates the Quorum Clause of the United States Constitution, and therefore it does not confer jurisdiction on district courts. Petitioner thus contends the Court lacked jurisdiction to convict him. (Motion at 4; Reply, ECF No. 159 at 15-17.)

Petitioner's jurisdictional challenge was raised and rejected in *United States v. Gonzalez-Arenas*, 496 F. App'x 866 (10th Cir. 2012):

> [Appellant] contends that the grant of criminal jurisdiction to federal district courts found in 18 U.S.C. § 3231 violates the Quorum Clause of the United States Constitution. In relevant part, the Quorum Clause provides that "a Majority of each [congressional chamber] shall constitute a Quorum to do Business." U.S. Const. art. 1, § 5, cl. 1. Gonzalez–Arenas argues that a quorum was not present for a vote taken in the House of Representatives when § 3231 was passed into law by the Act of June 25, 1948, Pub.L. No. 80–772, 62 Stat. 683 (codified in scattered sections of 18 U.S.C.). Thus, he concludes, his convictions should be vacated because the district court lacked jurisdiction. This argument is frivolous and "foreclosed by the 'enrolled-bill rule,' under which a bill certified by the presiding officers of each chamber [of Congress]—as was the case with § 3231, *see* 94 Cong. Rec. 568 (1948)—is 'complete and unimpeachable.'" *United States v. Small,* 487 Fed. Appx. 302, 303 (7th Cir. 2012) (unpublished) (quoting *Marshall Field & Co. v. Clark,* 143 U.S. 649, 672, 12 S. Ct. 495, 36 L.Ed. 294 (1892)); *see also United States v. Davis,* 375 Fed. Appx. 611, 612 (7th Cir. 2010) (substantially the same); *United States v. Farmer,* 583 F.3d 131, 151–52 (2d Cir. 2009) (same).

496 F. App'x at 867; *see Nelson v. United States*, No. 18-514C, 2018 WL 5318247, at *3 & n.4 (Fed. Cl. Oct. 29, 2018) (unpublished) (noting the petitioner's "contentions concerning Public Law 80-772 have previously been found to be frivolous").

Similarly, in *Buczek v. Constructive Statutory Trust Dep. Trust Corp.*, No. 1:10-cv-00382-MAT, 2011 WL 4549206, at *4, 2011 U.S. Dist. Lexis 111539, at *10 (W.D. N.Y. Sept. 29, 2011), the court concluded the same jurisdictional challenge was

"patently without merit." The court noted: "This contention, or a variation upon it, has been offered by countless federal prisoners as a basis for § 2255 relief and has been roundly rejected by all the federal courts [that] have considered such claims." 2011 WL 4549206, at *4, 2011 U.S. Dist. Lexis 111539, at *11. The court discussed a number of district court cases in which courts had rejected the argument, and it concluded:

> Based on these cases, the United States Supreme Court's consistent application of the statute in question as a foundation of jurisdiction, and the absence of any legitimate contrary authority, this Court likewise rejects Buczek's jurisdictional argument as wholly without merit. The "Quorum Issue", in short, does not present a claim upon which § 2255 habeas relief can be granted.

2011 WL 4549206, at *4-5, 2011 U.S. Dist. Lexis 111539, at *13-14 (footnote omitted).

The analysis set forth in *Gonzalez-Arenas*, 496 F. App'x at 867; *Nelson*, 2018 WL 5318247, at *3 & n.4, and *Buczek*, 2011 WL 4549206, at *4-5, 2011 U.S. Dist. Lexis 111539, at *13-14, is sound. Petitioner's jurisdictional claim fails.

## 2. Claims of ineffective assistance of trial counsel[2]

### a. Claims regarding counsel's comments at sidebar

Petitioner alleges trial counsel told the Court at sidebar that counsel believed Petitioner was guilty.[3] (Motion at 5; Reply at 6-7.) The sidebar conference at issue occurred immediately before Petitioner's testimony:

> [COUNSEL]: Your honor, I'm just so reluctant to be the facilitator of what I believe to be false testimony. I don't know that it is, but just am in a box.

> THE COURT: I think if you believe it but you don't know it for sure, then you're okay. I think it's an issue of whether your client told you A and now he want[s] to tell you B, that's a different matter but –

> [COUNSEL]: It's more than --

> THE COURT: -- the jury has a right to hear testimony and if you believe it's one way but your client tells you it's another way unless you – you know, you have your obligations under 3.3, I'll give you a copy.

> [COUNSEL]: I don't know anything that he has to say to be false.

> THE COURT: All right.

> [COUNSEL]: I believe in my mind, and it puts me in an ethical situation --

---

[2] Claims of ineffective assistance of appellate counsel, prosecutorial misconduct, and judicial bias are addressed in this section where they relate to claims of ineffective assistance of trial counsel. To the extent Petitioner asserts claims of prosecutorial misconduct and judicial bias independent of his claims of ineffective assistance, the claims of prosecutorial misconduct and judicial bias are procedurally defaulted because Petitioner did not raise them at trial or on appeal, and none of the claims raises issues of actual innocence, *see United States v. Frady*, 456 U.S. 152, 165 (1982); *Berthoff v. United States*, 308 F.3d 124, 127 (1st Cir. 2002); or prejudice, *see United States v. Laureano-Pérez*, 797 F.3d 45, 69 (1st Cir. 2015) (noting a party who alleges judicial bias must demonstrate "'serious prejudice'") (quoting *Logue v. Dore*, 103 F.3d 1040, 1045 (1st Cir. 1997)); *United States v. Rivera-Hernández*, 497 F.3d 71, 80 (1st Cir. 2007) (concluding that even assuming a meeting between a prosecutor and witnesses was improper, it was not prejudicial because it did not likely affect the outcome of the trial). Each of the claims is discussed further below.

[3] Petitioner noted that he withdrew a claim of judicial bias related to counsel's sidebar comments. (Reply, ECF No. 159 at 12.)

THE COURT: I understand.

[COUNSEL]: -- that I'm very uncomfortable with.

(Trial Tr. II at 134.)[4]

The fact that counsel informed the Court in a general way of his concerns about Petitioner's testimony does not constitute substandard practice. Counsel revealed no confidential information and did not otherwise breach his responsibility to his client. In addition, Petitioner was not prejudiced, because sidebar conferences, as a matter of course, are conducted out of the hearing of the jury and thus have no bearing on the jury's verdict. *See United States v. Martí-Lón*, 524 F.3d 295, 298 (1st Cir. 2008) (noting there was nothing in the record that "establishes or even suggests that the jury heard the reference" made at sidebar). Petitioner also cannot demonstrate prejudice because after the sidebar conference, Petitioner testified and the record lacks any evidence to suggest that counsel's examination of Petitioner was improperly influenced by the concerns he expressed at sidebar. (Trial Tr. II at 134-35.)

Furthermore, to the extent Petitioner alleges counsel's sidebar comment influenced the Court's sentencing finding that Petitioner had obstructed justice when he gave false trial testimony, the claim lacks merit because the Court's finding was based on Petitioner's testimony, not counsel's comments; the Court found "the defendant perjured himself during trial by denying possession of the gun and denying his activities vis-a-vis Forrest

---

[4] The Court's reference to "3.3" is evidently to Rule 3.3 of the Maine Rules of Professional Conduct. *See* Local Rule 83.3(e) of the United States District Court for the District of Maine (formerly Local Rule 83.3(d)).

Smith." (Sentencing Tr., ECF No. 138 at 72.) The First Circuit found no error in the imposition of the enhancement for obstruction of justice. *Colby*, 882 F.3d at 273-74 (noting "Colby flatly denied that he went to Smith's trailer on March 17, 2015 and threatened him," and "[h]e testified that he never touched" the gun). In short, Petitioner cannot demonstrate counsel's sidebar discussion resulted in prejudice to Petitioner.

### b. Claims regarding presentation of evidence and closing argument

#### i. Evidence of Petitioner's possession and use of the gun on March 17, 2015

The Government charged Petitioner with possession of a gun on March 17, 2015. At trial, therefore, the Government focused on the events of that date, particularly the evidence of Petitioner's use of the gun to threaten Smith, and the evidence of the means by which Petitioner disposed of the gun. The First Circuit summarized the evidence:

> In March 2015, Colby was living in a camper in Wiscasset, Maine on property owned by his father. Forrest J. Smith was a friend of Colby's father who lived nearby on Mountain Road in Woolwich, Maine. Smith had occasionally worked for Colby's father prior to Colby taking up residence on his father's land. A few days before March 17, 2015, Smith was walking home from Colby's father's house when he encountered Colby on the road. Colby threw an M-80 firecracker at Smith and said "if you turn around right now I'll shoot ya." Smith continued walking back to his trailer.

> On March 17, 2015, at approximately 3:00 PM, Smith heard someone knocking on the door to his trailer claiming to be from the power company. According to Smith's later testimony, Colby burst into the trailer, breaking the lock on the door. In response, Smith told Colby that he had called the cops about the firecracker incident. Colby stuck a gun in Smith's face and said "I ought to shoot you right now for calling the f-ing cops on me." Smith told Colby that he should leave, and Colby left the trailer still carrying the gun. Shortly thereafter, Smith called the police and reported that Colby had threatened him with a gun. Smith later described the gun as having "a short barrel" with "a brown, wooden handle."

Joey Rogers, who also lived on Mountain Road, testified at trial to the following. On March 17, 2015, he saw Colby walking up the road towards Smith's trailer at around 3:00 PM and, thirty to forty minutes later, he heard someone in his driveway trying to open the door to his truck. Looking over, Rogers saw Colby standing by his truck. According to Rogers, when he asked Colby what he was doing, Colby mumbled and started "pulling something from his sweatshirt pocket." Rogers could not see exactly what the object in Colby's pocket was, but he did see that it had a handle. As Colby walked towards Rogers, Rogers' dog ran at Colby. Colby took off running across the road, through a ditch, and into the woods.

*Colby*, 882 F.3d at 269-70. Later that day, Petitioner spoke with Jyllian York, whose mother owned the gun, to inform her and her boyfriend, Cody Wyman, that Petitioner had left the gun in the woods:[5]

On the evening of March 17, 2015, Jyllian texted and called Colby to ask him again if he had the gun or knew where it was. According to Jyllian, Colby told her that he had taken the gun and left it in a snowbank in the woods near Mountain Road. Jyllian and Wyman went out that night to look for the gun in the woods. In a series of text messages and phone calls, Colby tried to explain where he had put the gun, telling them that it was "stashed in snow . . . [a]t the end of the tracks." When Jyllian and Wyman still could not find the gun, Colby texted that he would "run in the woods with Cody and get it" in the morning.

*Colby*, 882 F.3d at 270.

Petitioner testified at trial, and although he admitted he had thrown a firecracker at Smith a few days before March 17, 2015, he testified he did not intend to hurt Smith, and he denied that he was at Smith's trailer on March 17, 2015, or that he touched the gun. *Id.*

Petitioner alleges counsel was ineffective because he failed adequately to challenge the allegation that Petitioner used the gun of conviction, a .38 revolver, to threaten Smith,

---

[5] Cody Wyman is also referred to as Stuart Wyman in the record. *United States v. Colby*, 882 F.3d 267, 270 (1st Cir. 2018). (Trial Tr. I, ECF No. 113 at 126.)

given that Smith reported to law enforcement that the weapon used was a .22 revolver.[6] (Reply at 2.) Specifically, Petitioner alleges counsel should have engaged a gun expert to testify about the differences between the two types of revolvers. (Reply at 2.)

Contrary to Petitioner's argument, the record establishes that under the circumstances of this case, counsel was not required to engage an expert. Through cross-examination of Smith regarding Smith's past ownership of a .22 and Smith's

---

[6] Petitioner alleges judicial bias based on the Court's denial of Petitioner's motion to exclude Smith's testimony. (Reply at 11; Motion to Exclude, ECF No. 40; Oral Order, ECF No. 71.) The Court noted it had reviewed the parties' written argument on the motion, and it denied the motion because the testimony was relevant and there was no undue prejudice. (Conference Tr., ECF No. 137 at 11.) There is no evidence the ruling was the result of judicial bias, or that it caused serious prejudice to Petitioner. *See Laureano-Pérez*, 797 F.3d at 69.

Petitioner additionally alleges the Government inaccurately stated in closing argument that Smith testified there was a horse emblem on the side of the gun used to threaten him. (Reply at 6.) The prosecutor stated:

> In addition, Ms. York testified that her mother's .38 caliber revolver, which the defendant told her in these text messages he had himself, the same day Forrest Smith said he was threatened with a revolver and the same day Joseph Rogers said that the defendant was on his way from Woolwich out of the woods, where the gun was recovered, he had – that it had a horse emblem on it. Jyllian York indicated her mother's firearm had a horse emblem on it, and I would like you to look carefully when you have the firearm at the horse emblem.

(Trial Tr. II, ECF No. 114 at 200.) The prosecutor did not misrepresent Smith's testimony.

Petitioner also alleges the prosecutor misled the jury concerning the difference in size between a .22 and a .38 caliber bullet and the corresponding difference in size of the gun barrels of the two types of revolvers. (Reply at 13-14.) Petitioner's allegation that the prosecutor failed to show the jury the difference in the size of the gun barrel, even if proven, would not amount to prosecutorial misconduct, and, in any event, Petitioner was not prejudiced. A law enforcement officer testified that Government's Exhibit 1-B was a photograph that showed two .22 caliber revolvers and a .38 caliber revolver, with the view "of the barrels, at the end of the barrel looking back towards the cylinder of the firearm, so if it were facing you, the end of the gun would be pointing at you." (Trial Tr. II at 59-61.) On cross-examination, counsel elicited from the law enforcement officer that the relevant measurement, for purposes of the victim's ability to distinguish a .22 revolver from a .38 revolver, was not the bullet size, but rather the obvious difference in the size of the bore of the gun barrel, because the bore would have been the part of the gun nearest to the victim when Petitioner allegedly threatened him with the gun. (Trial Tr. II at 63-65.)

familiarity with the differences between a .22 and a .357 Magnum, (Trial Tr. I at 85-87), and through direct examination of a law enforcement officer regarding Smith's report that "he thought it was a .22 caliber revolver," (Trial Tr. II at 80-81), counsel was able to demonstrate the differences between the two models.

Petitioner's contention that counsel should have called a carpenter to testify that the door to Smith's trailer opened outward, to counter Smith's testimony that Petitioner gained entry by forcibly pushing the door in similarly fails.[7] (*Id.*) A carpenter's testimony was not necessary; counsel first elicited from Smith that Petitioner broke into his trailer by pushing the door in, then he obtained Smith's concession that the door opened out, not in, and that the door frame would have prevented the door from being pushed in. (Trial Tr. I at 92-94.) Counsel also elicited testimony on direct examination from a law enforcement officer that Smith told the officer Petitioner had broken the lock on the door to Smith's house by pushing the door in. (Trial Tr. II at 79.) In closing argument, counsel pointed out the discrepancy in Smith's testimony about which way the door opened. (*Id.* at 212.) Counsel's approach to the issue was sound and does not support a claim of ineffective assistance.

Petitioner alleges counsel should have impeached Rogers, who testified as to Petitioner's movements outside Rogers' home on March 17, 2015, based on the timing of Rogers' statements to law enforcement (a week after the incident) and based on the alleged differences between Rogers' oral and written statements. (Reply at 4.) Rogers testified on

---

[7] Counsel offered an affidavit of a carpenter at sentencing. (*Id.*)

direct examination that he provided a statement "a few days" after the incident; Petitioner

did not explain why counsel should have inquired further about the date on which Rogers

provided the statement to law enforcement (Trial Tr. I at 119), and otherwise failed to cite

any persuasive evidence that would support his claim of ineffective assistance in

connection with counsel's examination of Rogers.[8]

Petitioner alleges counsel failed to call two alibi witnesses whose testimony,

Petitioner contends, would have provided evidence Petitioner did not threaten Smith with

the gun.[9]  (Motion at 5, 7; Reply at 1.)  Petitioner's claim regarding alibi witnesses is

contradicted by Petitioner's own trial testimony; Petitioner did not deny being on the road

where and when Rogers saw Petitioner on March 17, 2015.  (Trial Tr. II at 140-41.)

Although Petitioner testified he did not remember an encounter with Rogers outside

---

[8] Petitioner evidently contends in part that counsel did not devote sufficient time to the cross-examination of Rogers.  Petitioner's argument is unavailing.  In fact, before concluding the examination, counsel elicited from Rogers the concession that he was not able to identify the item Petitioner was carrying.  Rogers testified on direct examination that Petitioner "was pulling something from his sweatshirt pocket," and when asked whether he saw what Petitioner was touching in the pocket, Rogers responded, "I saw a handle of something," but he did not remember the color of the handle, and he could not with "[one] hundred percent" certainty, identify the object. (Trial Tr. I at 114, 119.) On cross-examination, counsel asked, "You weren't able to see what was inside the sweatshirt; isn't that right?"  (*Id.* at 122.)  Rogers responded:  "Not one hundred percent." (*Id.*)

[9] Petitioner's efforts to obtain alibi witnesses were established at sentencing.  The Court found the facts as set forth in the revised presentence investigation report.  (Sentencing Tr., ECF No. 138 at 72.)  The report stated that on April 15, 2015, personnel at the Two Bridges Jail intercepted a letter Petitioner wrote "attempting to solicit assistance in establishing an alibi that he was someplace else at the time when F.J.S. was threatened with a firearm . . . ."  (Report, ¶ 9.)  Although Petitioner did not specify in his section 2255 motion that the witnesses at issue were alibi witnesses, the motion is interpreted liberally to include the claim.  (Motion at 5, 7; Reply at 1.)  *See United States v. Ciampi*, 419 F.3d 20, 24 (1st Cir. 2005).

In addition to Petitioner's allegation that alibi witnesses would have provided evidence he did not threaten Smith, Petitioner alleges the alibi witnesses would have testified that Petitioner could not have received the firearm after St. Patrick's Day.  As discussed below, Petitioner is not entitled to relief on section 2255 claims concerning Petitioner's possession of the gun after March 17, 2015, the date alleged in the indictment.

Rogers' house, Petitioner later corroborated a significant portion of Rogers' testimony when Petitioner admitted: "I do think I remember a dog barking and running at me, so I kind of hustled a little bit." (*Id.* at 141.) The admission would have undermined the effectiveness of any alibi defense.

Petitioner alleges counsel failed adequately to cross-examine a Verizon Wireless witness concerning Petitioner's text messages to York and Wyman. (Reply at 3.) *Colby*, 882 F.3d at 270. Petitioner contends that some of the text messages were unsent drafts, some could not reliably be attributed to Petitioner, and some "were displayed out of order, with just the message part highlighted, to make some messages look like they were answering other messages." (Reply at 3-4.) Petitioner alleges the presentation of text messages was designed "to make it look more likely that criminal activity took place." (*Id.* at 4.)

Given that the Verizon Wireless witness testified that the messages in evidence had been sent, and that the Government's summaries of the messages (Exhibits T-17, T-18) were in chronological order (Trial Tr. I at 195-96), the record lacks any evidence to suggest the witness' testimony was vulnerable to a successful challenge. Petitioner's ineffective assistance claim concerning the Government's presentation of the text messages fails because it is vague and unsupported by the record.[10]

---

[10] Petitioner alleged the prosecutor improperly coached witnesses on the basis that "in some of the pre-trial motions it showed that [the prosecutor] had already known what the witnesses [were] going to say;" Petitioner alleged specifically that the prosecutor improperly coached its Verizon Wireless witness, because

Petitioner alleges counsel should have clarified, on direct examination of Petitioner at trial, that the gun was found on property that did not belong to Petitioner.[11] (Reply at 5.) Counsel's failure to address the ownership status of the property where the police found the gun does not reflect deficient performance, because the Government was not required to prove Petitioner owned or rented the property where the gun was found in order to prevail on a theory of constructive possession. *See United States v. Duval*, 496 F.3d 64, 77-78 (1st Cir. 2007) (concluding "the law of constructive possession was substantially incorporated into the charge" under 18 U.S.C. § 922(g)(1), and "the court very clearly instructed the jury that to find constructive possession it needed to find both 'power and intention to exercise control or dominion and control over something,' and that Defendants 'knowingly possessed the firearms and/or ammunition in question'") (quotation marks omitted); *United States v. Luster*, 896 F.2d 1122, 1129 (8th Cir. 1990) (recognizing that constructive possession may be based on control over the item itself, or, alternatively, on "dominion over the premises where the item is located") (quotation marks omitted). The

---

the witness "was claiming to know the names of [people's] phones that they had, when they all had unregistered [straight] talk plans." (Reply at 14.)

"Prosecutors and defense attorneys alike are entitled to prepare their witnesses." *Rivera-Hernández*, 497 F.3d at 80 (concluding that even assuming a meeting between a prosecutor and witnesses was improper, it was not prejudicial because it did not likely affect the outcome of the trial). The Verizon Wireless witness testified that Verizon maintains records of "subscriber information," which includes the identity of "the person who activated the service." (Trial Tr. I at 192-93.) Petitioner has failed to demonstrate either that the Verizon Wireless witness's testimony was the product of impermissible coaching, or that Petitioner was prejudiced.

Petitioner also claims judicial bias based on an evidentiary ruling that, Petitioner alleges, permitted the prosecutor "to destroy a page of the text messages because of 'spelling errors.'" (Reply at 11.) The judicial bias claim is without merit.

[11] Petitioner noted that he withdrew a claim of judicial bias related to the jury instruction on constructive possession. (Reply at 12.)

ownership of the property was not a material issue in the case and the fact that counsel did not establish Petitioner did not own the property does not constitute substandard performance.

### ii. Evidence of the gun's location before March 17, 2015

Petitioner's claim also involves counsel's performance as to the evidence regarding the location of the gun in the days before March 17, 2015. Although the Government's case was based on Petitioner's possession of the gun on March 17, 2015, the Government offered evidence of the circumstances under which the gun had gone missing from the home of its owner, Stacey Doray, a few days before March 17:[12]

> Three days earlier, on March 14, 2015, Colby had visited Gregory Doray at his mother Stacey Doray's house. Jyllian York, Gregory's sister who was nine months pregnant and on bedrest at the time, also lived with Stacey. At some point that day, Jyllian took Stacey's gun from Stacey's bedroom closet and hid it in her own bedroom closet. According to Jyllian's later testimony, she took the gun to give it to Gregory because she thought Gregory was in trouble with "bad people" and might need it. Colby, Gregory, and Gregory's girlfriend all ended up sleeping in the living room at Stacey's house that night.
>
> The next morning, on March 15, 2015, Jyllian's boyfriend Cody Wyman discovered that the gun was missing from Jyllian's closet. Jyllian was scared that her mother would find out that she had taken the gun and did not, at that point, tell her mother that the gun was missing. After searching her room for about two hours, Jyllian asked everyone who had spent the night, including Colby, if they had the gun or knew where it was. No one would admit they had it.

*Colby*, 882 F.3d at 270.

---

[12] York testified Stacey Doray is her mother, and Gregory Doray is her half-brother. (Trial Tr. I at 127-28, 164.) York referred to her brother alternately as Gregory or Greg. (Trial Tr. I at 128, 178.)

In closing argument, the prosecutor explained that the Government alleged Petitioner possessed the gun on March 17, 2015, only, because the Government had no evidence Petitioner took the gun from Stacey Doray's home and possessed it on an earlier date. (Trial Tr. II at 231.) The prosecutor further explained that the Government theorized that Petitioner may have received the gun from Greg Doray.[13] (*Id.*) Petitioner testified York and Wyman asked him to go to Greg Doray's home in Gardiner, Maine, to inquire about whether Greg had the gun. (*Id.* at 143-44.) *Colby*, 882 F.3d at 270 (noting "Colby claimed that Gregory had taken the gun and brought it to his girlfriend's home in Gardiner"). Petitioner's testimony, therefore, was consistent with the Government's theory that posited Greg Doray had possession of the gun at some point.[14]

Petitioner contends counsel did not adequately cross-examine York about significant differences between her reports to law enforcement and her trial testimony as to whether Petitioner took the gun from Stacey Doray's home. (Motion at 5; Reply at 4-5.) Petitioner alleges York first told law enforcement Petitioner took the gun, but she

---

[13] Petitioner contends the Government was required to inform him before trial, but did not, that the Government would assert that Greg Doray at some point received the gun taken from Stacey Doray's house. (Reply at 13.) The Government did not have such an obligation because, to the extent the Government may have had evidence that Greg Doray possessed the gun before Petitioner obtained it, the evidence was not inconsistent with evidence of Petitioner's possession of the gun on March 17, 2015. *See Brady v. Maryland*, 373 U.S. 83 (1963) ("We now hold that the suppression by the prosecution of evidence *favorable to an accused* upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.") (emphasis added).

[14] Petitioner additionally testified that "he and Gregory then arranged to have a mutual friend place the gun in the woods so that they could return it to Stacey. Colby explained that he texted Jyllian directions to where he thought the mutual friend had left the gun." *Colby*, 882 F.3d at 270. (Trial Tr. II at 150.) Petitioner testified that Greg Doray participated in the plan for the mutual friend to return the gun because Greg wanted Stacey Doray, who was Greg's mother, to have the gun back, and Greg hoped his parents would not suspect he had stolen the gun. (Trial Tr. II at 150.)

testified at trial that she took the gun with the intent to give it to Greg Doray.[15] (Reply at 4.) Petitioner alleges counsel failed to permit him to review grand jury testimony, and counsel failed to object to an alleged *Brady* violation for withholding from Petitioner grand jury testimony regarding who took the gun from Stacey Doray's house.[16] (Reply at 2-3.) Petitioner contends there was grand jury testimony that York and Wyman, to protect themselves and Greg Doray from prosecution, "fabricated the story that [Petitioner] had taken the gun." (*Id.* at 2.) Petitioner alleges counsel should have called the grand jury witnesses to testify at trial. (*Id.* at 4-5.)

---

[15] Petitioner alleges the Government knowingly elicited perjured testimony from York that Petitioner took the gun from Stacey Doray's house. (Reply at 13.) York testified, on direct examination by the Government, that she saw Petitioner at Stacey Doray's house on March 14-15, 2015, when the gun went missing. (Trial Tr. I at 130-33, 157.) York testified that on March 17, 2015, Petitioner told her "he took the gun and disposed of it in a snowbank in the woods, about like 10 to 20 feet into the woods, and he told me where to find it." (*Id.* at 134.) York testified Petitioner did not tell her how or when he obtained the gun. (*Id.* at 146-47.) To the extent Petitioner's claim is based on the Government's failure explicitly to address York's testimony that Petitioner "took the gun," Petitioner is not entitled to relief, because the Government corrected any misperception the jury may have had that the Government implicated Petitioner with the disappearance of the gun from Stacey Doray's house, and therefore no prejudice resulted. (Trial Tr. II at 231.) *See Giglio v. United States*, 405 U.S.150, 154 (1972) (holding "[a] new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury'") (quoting *Napue v. Illinois*, 360 U.S. 264, 271 (1959)).

Petitioner also alleges the prosecutor impermissibly coached York at trial when the prosecutor allegedly signaled to York, through a throat-clearing vocalization that does not appear in the trial transcript, to change York's answer to a question regarding whether Petitioner was at someone's house. (Reply at 14.) Petitioner does not identify the allegedly improperly coached testimony with any specificity, and it is not otherwise apparent from the record. *See David*, 134 F.3d at 478. In any event, Petitioner cannot demonstrate prejudice, because no material fact at trial turned on York's testimony about whether Petitioner went to any house about which York testified.

[16] Petitioner's *Brady* claim fails on the merits because Petitioner does not allege the Government withheld grand jury testimony from counsel, *i.e.*, from the defense. *See United States v. Agurs*, 427 U.S. 97, 103 (1976) (noting *Brady* applies to certain types of situations, each of which "involves the discovery, after trial of information which had been known to the prosecution but unknown to the defense"). Because the *Brady* claim lacks merit, Petitioner's related claim of ineffective assistance of appellate counsel for the failure to pursue a *Brady* argument on appeal also fails. (Reply at 7-8.) *See Tse v. United States*, 290 F.3d 462, 465 (1st Cir. 2002) (per curiam).

Petitioner's challenge to counsel's examination of York is not supported by the record. Counsel in fact conducted extensive cross-examination of York on her statement that she took the gun from her mother's closet.[17] York's testimony that she removed the gun from Stacey Doray's closet also demonstrates the lack of merit in Petitioner's argument that counsel was required to call certain grand jury witnesses to testify.

Petitioner also alleges counsel failed to ask him on direct examination about the motives and biases of York, Wyman, and Greg Doray. (Reply at 5.) Petitioner's allegation is not supported by the record; Petitioner did testify to his belief regarding the motivation of York, Wyman, and Greg Doray. (Trial Tr. II at 142-44, 147-50.) Furthermore, counsel argued in closing that York considered Petitioner "a fall guy" for her, Wyman, and,

---

[17] York testified on direct examination that she took the gun from her mother's closet to give it to Greg Doray, but that she did not give the gun to Greg, and she did not see anyone else give the gun to him. (Trial Tr. I at 130-31.) On cross-examination, counsel asked questions that may have undermined York's credibility:

> Q. And you were going to try to get this weapon and give it to him.
>
> A. I was going to try to go to my brother who might need it for safety. *It was brought* as a precaution; it wasn't like I was going to just hand it off to him and –

(*Id.* at 164-65 (emphasis added).)

> Q. And so you wanted him to have this gun for himself, for his protection.
>
> A. It was more or less I wanted to maybe go and make sure that my brother was okay, and *I brought the gun along just in case* because there is people like that out there.
>
> Q. All right. So you brought the gun along just in case.
>
> A. But I never left the house. I told you that two hours after I found out that Gregory was okay and I put the gun in my closet. The gun never left the house in my or Cody's possession.

(*Id.* at 172 (emphasis added).)

particularly, Greg Doray, who was a convicted felon. (Trial Tr. I at 190; Trial Tr. II at 217-18.) Although the jury found Petitioner guilty despite the defense strategy and theory, counsel's performance was not substandard, nor was Petitioner prejudiced. *See Strickland*, 466 U.S. at 699.

### iii. Evidence of the gun's location after March 17, 2015

On March 18, 2015, an officer on patrol spotted York and her sister in the woods near their parked car. *Colby*, 882 F.3d at 270. York told the officer they were searching for a gun; law enforcement took over the search and found the gun in the place where York had been looking for it, "[s]ome time later, after the snow had melted." *Id.*

Petitioner alleges counsel should have obtained an expert to testify that if the gun had been where law enforcement initially searched for it, the search dog law enforcement used would have found the gun on the initial search; Petitioner contends such testimony would have supported the defense.[18] (Reply at 2.)

In essence, Petitioner contends his counsel's performance was substandard because counsel failed to call an expert to help establish the gun was not located where Petitioner, in contemporaneous text messages, told York it was located. Particularly given the time of year with snow on the ground, the fact that law enforcement did not find the gun on the initial search is not inconsistent with other evidence, particularly Petitioner's text messages, that Petitioner possessed the gun on March 17, 2015, and that he left it in the location where the searches were later conducted. Furthermore, to the extent Petitioner

---

[18] Counsel offered an affidavit of such an expert at sentencing. (Sentencing Tr. at 17-18.)

contends the gun was subsequently planted in the area to implicate him, Petitioner has not demonstrated that an expert witness would have supported such an argument.[19]

Petitioner alleges counsel should have called a witness who would have testified that after Petitioner had been charged and was in jail, but before law enforcement recovered the gun, someone other than Petitioner possessed the gun and tried to sell it to the witness. (Reply at 2.) The allegation that someone else may have possessed the gun sometime after March 17, 2015, even if proven, would not entitle Petitioner to relief. Therefore, counsel's failure to call the witness was not substandard performance, and Petitioner was not prejudiced.

Petitioner alleges counsel failed to ask him on direct examination about the fact that Petitioner's fingerprints were not found on the gun. (Reply at 5.) Petitioner's claim is meritless. The Government stipulated to the fact that the Maine State Police Crime Laboratory found, as the Government represented in court, that "neither the defendant's fingerprints nor his DNA were detected" on the gun. (Trial Tr. II at 51.) Consistent with the stipulation, counsel argued in closing that no DNA or fingerprints were found on the gun. (*Id.* at 221-22.)

---

[19] Although the whereabouts of the gun after the March 17, 2015, date alleged in the indictment was not relevant to the charge, counsel argued in closing, that someone planted the gun after law enforcement's initial unsuccessful search for it, in the location where Petitioner had said it was, in order to implicate Petitioner and protect Greg Doray, a convicted felon, from prosecution for possession of a stolen weapon. (Trial Tr. II at 220-21.)

### 3. Additional claims regarding appellate counsel

Petitioner alleges appellate counsel should have argued Petitioner was not found guilty of criminal threatening with a firearm in Sagadahoc County, as the state charges were dismissed after Petitioner's federal sentencing. (Reply at 8.) The state charges were related to the federal possession crime, and the state charges did not result in criminal history points, according to the revised presentence investigation report, the findings of which the Court adopted at sentencing. (Report, ¶ 45; Sentencing Tr. at 72.) Because the state charges did not affect Petitioner's guidelines range or the sentencing factors under 18 U.S.C. § 3553(a), appellate counsel's performance was not substandard, and Petitioner was not prejudiced, by appellate counsel's failure to raise the issue of dismissal of the state charges.[20]

Petitioner contends appellate counsel was ineffective because counsel failed to argue that because the jury did not need to find Petitioner had threatened Smith in order to find Petitioner guilty of possession of the gun, the Court erred when it applied the four-level sentencing enhancement. (Reply at 8-9.) To the extent Petitioner contends the evidence was insufficient for the sentencing finding, the issue was resolved on appeal; this Court made a sentencing finding that Petitioner possessed the gun in connection with the felony offense of criminal threatening with a dangerous weapon, and the First Circuit found no error, based on the "more than sufficient evidence" that Petitioner possessed the firearm

---

[20] At sentencing, the Government represented to the Court that if Petitioner were not given credit for the 234 days he had served in state custody prior to his federal sentencing, the Government would move for Petitioner to receive the credit. (Sentencing Tr. at 54-55.)

before March 17, 2015, and because the sentencing court "found Smith's account of the incident at his trailer largely credible."  *Colby*, 882 F.3d at 273.  Although Petitioner alleges appellate counsel did not argue effectively that the sentencing court erred, counsel made the argument.  (Appellant's Brief at 44-47.)  The fact that that the argument was unsuccessful is not in itself a basis for a successful ineffective assistance claim.  *See Strickland*, 466 U.S. at 699.

Furthermore, as a matter of law, this Court could permissibly find at sentencing that the Government had proven by a preponderance of the evidence Petitioner committed the offense of criminal threatening with the gun, notwithstanding the lack of a jury finding. *See United States v. Rodriguez-Reyes*, 714 F.3d 1, 12 (1st Cir. 2013) (noting "[*Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)] provides only that a jury must find any facts (other than a prior conviction) that would increase the penalty for a crime *beyond* the otherwise applicable statutory maximum") (emphasis in original).  In Petitioner's case, the four-level increase in the sentencing range for criminal threatening did not increase the sentence beyond the ten-year statutory maximum under 18 U.S.C. § 924(a)(2), and the increase did not constitute a "disproportionate share" of Petitioner's sentence.  *See United States v. González*, 857 F.3d 46, 59-60 (1st Cir. 2017) (rejecting the appellant's argument that *Apprendi* and *Alleyne v. United States*, 570 U.S. 99 (2013), should be interpreted "to mean that any enhancement for an uncharged or unconvicted crime that dramatically increases a defendant's Guidelines range should be proven beyond a reasonable doubt;" and concluding that because the appellant's sentencing increases did not constitute

"a disproportionate share of the sentence," the "relevant conduct offense-level increases did not violate his Sixth Amendment or due process rights").

In an additional claim concerning appellate counsel, Petitioner alleges he can produce a letter in which counsel "mentions that he [doesn't] like cases where he gets appointed because he does not get paid nearly enough . . . ." (Reply at 10.) Petitioner alleges he was prejudiced because counsel did not devote enough effort on the appeal. (*Id.*) Petitioner provides no factual support for his argument.

### 4. Additional claims of judicial bias

In addition to the claims of judicial bias addressed above, Petitioner alleges bias at sentencing, based on the Court's alleged failure to review grand jury testimony provided on a disk, and based on the Court's failure to consider several mitigating factors. (Reply at 11-12.) Petitioner's argument is baseless.

At sentencing, the Court noted the disk of sentencing exhibits Petitioner had filed (Cover letter, ECF No. 119); the Court admitted the entire contents of the disk as a sealed exhibit, and, before finding the sentencing facts, the Court noted it had reviewed, among other things, the evidence presented at the sentencing hearing. (Sentencing Tr. at 11-12, 71.) The Court also considered Petitioner's sentencing memorandum, which set forth several mitigating factors; the Court considered specifically Petitioner's intelligence and his post-arrest efforts at rehabilitation in the Court's consideration of the sentencing factors under 18 U.S.C. § 3553(a), and the Court concluded Petitioner's rehabilitation efforts warranted a reduction from the high end of the guidelines range. (Sentencing Memorandum, ECF No. 117 at 6-8; Sentencing Tr. at 73-75.)

Petitioner's claims of judicial bias at sentencing fail because they are unsupported in the record, and he has failed to demonstrate prejudice. *See United States v. Laureano-Pérez*, 797 F.3d 45, 69 (1st Cir. 2015); *Moreno-Morales*, 334 F.3d at 145; *David*, 134 F.3d at 478.

## III.    CONCLUSION

Based on the foregoing analysis, an evidentiary hearing is not warranted under Rule 8 of the Rules Governing Section 2255 Cases. In addition, I recommend the Court deny Petitioner's motion for habeas relief under 28 U.S.C. § 2255. I further recommend that the Court deny a certificate of appealability pursuant to Rule 11 of the Rules Governing Section 2255 Cases because there is no substantial showing of the denial of a constitutional right within the meaning of 28 U.S.C. § 2253(c)(2).

## <u>NOTICE</u>

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 23rd day of April, 2019.